J-S75008-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| DAVID E. A. SEAGREN | |
| Appellant | No. 485 WDA 2019 |

Appeal from the Judgment of Sentence Entered May 15, 2015
In the Court of Common Pleas of Crawford County
Criminal Division at No: CP-20-CR-0000503-2014

BEFORE: STABILE, KUNSELMAN, and PELLEGRINI,[*] JJ.

MEMORANDUM BY STABILE, J.:                    FILED APRIL 16, 2020

Appellant, David E. A. Seagren, appeals nunc pro tunc from the May 15, 2015 judgment of sentence imposing an aggregate 60 to 240 months of incarceration for multiple counts of theft by deception, theft by unlawful taking, and forgery.[1]  We affirm.

Appellant's convictions arose out of his filling out, in full or in part, the victim's checks payable to Appellant.  The checks, dated from October 2011 to December 2013, totaled $189,750.00.  The elderly victim gave a videotaped deposition, at age 97, on July 17, 2014.  The parties completed discovery beforehand, and Appellant was able to cross-examine the victim on

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 3922, 3921, and 4101.

all available evidence. By the time of trial in March of 2015, the victim, then age 98, had moved to an assisted living facility. The trial court declared the victim unavailable after hearing testimony that transporting her to trial would be detrimental to her health. The trial court permitted the Commonwealth to present the victim's videotaped deposition in lieu of her live testimony. This Court affirmed the judgment of sentence on February 8, 2016. Appellant filed a timely first PCRA petition on October 13, 2016 and, on November 19, 2018, the PCRA court granted Appellant the right to file post-sentence motions nunc pro tunc and take a new direct appeal. Appellant filed his nunc pro tunc post-sentence motion on December 3, 2018. The trial court denied relief on March 1, 2019, and this timely appeal followed.

Appellant raises three issues:

1. Was it an abuse of discretion and was Appellant deprived of his constitutional right to a fair trial when the trial court determined that the victim/witness was unavailable for trial?

2. Did the trial court abuse its discretion and deny Appellant his right to a fair trial when it permitted use of the videotaped deposition instead of live testimony by the victim/witness?

3. Was Appellant deprived of his right to a fair trial and did the trial court abuse its discretion when the trial court determined the victim/witness to be competent at the time of her deposition without an expert evaluation or expert testimony on the matter?

Appellant's Brief at 10.

Having reviewed the record, the applicable law, the parties' briefs, we will adopt the trial court's opinions of July 7, 2019 and October 20, 2014 as

our basis for affirming the judgment of sentence. In his first assertion of error, Appellant claims the trial court erred when it ruled the victim unavailable under Pa.R.E. 804(a)(4), which permits the trial court to declare a witness unavailable when the witness because of a then-existing infirmity or physical illness. Pa.R.E. 804(a)(4). Appellant acknowledges that the victim's doctor testified she was suffering from chronic obstructive pulmonary disease and congestive heart failure, among other ailments, as of the time of trial. Appellant's Brief at 17. The doctor testified that the victim's appearance at trial would have been detrimental to her health.

In his second issue, Appellant argues the trial court erred in permitting the jury to view the victim's prior videotaped deposition. Rule 804(b)(1) permits the admission of former testimony given in a lawful deposition and offered against a party who had an opportunity and motive to examine the witness. Pa.R.E. 804(b)(1). That is precisely what occurred here. The parties conducted discovery prior to the victim's deposition, and the trial court granted the Commonwealth's motion to preserve her testimony in the event she was unavailable at trial, as per Pa.R.Crim.P. 500(A)(1).[2] Thus, Appellant had a full opportunity and strong motive to cross-examine the victim.[3]

_____

[2] The trial court notes that Appellant agreed with this course of action at the time. Trial Court Opinion, 7/7/19, at 2.

[3] We observe that Appellant raises no argument under Crawford v. Washington, 541 U.S. 36 (2004), and its progeny.

Finally, Appellant argues the trial court erred in determining that the victim was competent at the time of her video deposition. The trial court notes that Appellant never offered any specific ground on which the victim was incompetent. After the deposition, Appellant sought to disqualify the victim based on various incidents of the victim's alleged faulty memory at the deposition. The trial judge who found the victim competent noted that some of the instances of faulty memory arose from specific questions about specific checks, and many checks were at issue in this case. Trial Court Opinion, 10/20/14, at 4. In rejecting Appellant's nunc pro tunc post-sentence motions, the trial court wrote that Appellant failed to articulate any basis upon which the victim was incompetent, and that the jury was free to assess the credibility and weight of the victim's testimony. Trial Court Opinion, 7/7/19, at 7.

For reasons explained in more depth in the trial court's opinions of July 7, 2019 and October 20, 2014, we find Appellant's arguments to be of no merit. We affirm the judgment of sentence based on those opinions, and we direct that a copy of each be filed along with this memorandum.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/16/2020

- 4 -

Circulated 03/27/2020 02:14 PM

IN THE COURT OF COMMON PLEAS OF CRAWFORD COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH,
   Plaintiff

v.                                    CR 503-2014

DAVID SEAGREN,
   Defendant

*Douglas Ferguson, Esq., Attorney for Commonwealth*
*Robert E. Draudt, Esq., Attorney for the Defendant*

## Pa. R.A.P. 1925 OPINION

Mark D. Stevens, J.                                          June 7, 2019

Upon receipt of the Defendant David Seagren's Statement of Matters Complained of on Appeal, the undersigned files of record the following brief opinion of the reasons for its order.

The Defendant was found guilty by jury trial and thereafter sentenced on April 30, 2015 to an aggregate sentence of 60 to 480 months imprisonment. Following filing of appeals and various PCRA filings and having held applicable hearings, this Court ultimately granted the Defendant the right to file post-sentence motions *nunc pro tunc*.

The Defendant, through counsel, then filed Post-Sentence Motions on December 3, 2018, which this Court denied by Memorandum and Order on March 1, 2019. The Defendant then sought to appeal this Court's March 1, 2019 order and this Court directed the Defendant to file a Concise Statement of Matters Complained of on Appeal on April 4, 2019. The Defendant then filed a Motion for Extension of time, which this Court granted by Order dated April 11, 2019 and set the time limit for which to file his Concise Statement as twenty-one (21) days after April 23, 2019. On May 14, 2019, the Defendant filed his Concise Statement currently before the Court.

In his Concise Statement, the Defendant raises many issues, primarily focusing upon the deposition, testimony, and competency of the Victim and whether the evidence of record as presented to the jury supported the jury's verdict on the multiple counts.

The Defendant first argues that this Court erred in ordering that a deposition be taken from the Victim and also that a competency determination should have been performed before the deposition was taken. At the outset, the Court notes that it authorized the deposition to be taken of the Victim to preserve her testimony for possible use at trial if the Victim ultimately was found unavailable. As is explained further below, the decision to take the Victim's deposition

1

109

was agreed upon by the parties, and was appropriate, given the facts and circumstances of the case known at the time, to ensure that both parties had a full and fair opportunity, before, during, and after the deposition to develop their record and preserve and develop any issues as each party saw fit.

On May 19, 2014, the Commonwealth filed a Motion to Preserve the Testimony of the Victim in this case by video deposition. The Commonwealth cited the Victim's "advanced age" of 97-years old and the Victim's "current physical condition" as its reasons for requesting the video deposition.

On June 4, 2014, after a hearing on the Commonwealth's Motion to Preserve Testimony, this Court determined that taking a deposition to preserve the Victim's testimony was appropriate. In fact, neither party objected to taking the deposition of the Victim's testimony, as all parties agreed it would be appropriate. Counsel for the Defendant at the time of the June 4 hearing preliminarily raised the issue of the Victim's competency, despite not being able to point to a specific factual basis with which counsel could conclude that the Victim/witness was not competent, as noted in this Court's order.

At the time of the June 4, 2014 Order, the Court directed that prior to the deposition being taken, the Commonwealth should insure that counsel for the Defendant had all outstanding discovery at least 30-days in advance of the scheduled deposition. Additionally, the Court directed that the parties raise objections on the record and the Victim thereafter answer the question and then the matter would be reviewed. The Court, referencing the competency issue preliminarily raised by defense counsel, noted that the parties should address and create a factual record on the issue of competency at the time of the deposition so that to the extent that competency remained an issue it could be addressed by the Court prior to presentation of the testimony to the fact finder. The Court then allowed that, in the event that the parties believed that a preliminary determination of competency was required prior to the deposition commencing they could file a motion so as not to delay the deposition. The thought process of the Court was that the issue of competency could adequately be addressed after the deposition was concluded by reference to the deposition itself and expected that the parties would address the standards of competency during their examination of the Victim. As such, the Judge reviewing the Victim's competency would have the benefit of the deposition as it related to the competency issue and also had the benefit of the testimony of the Victim to the extent appropriate and relevant in its entirety on the issue in question.

The Court did provide in the June 4 order an opportunity for the parties to raise, prior to the deposition, any issue regarding the health and welfare of the Victim including the ability to seek a protective order.

Counsel for the Defendant now suggests that the competency of the Victim should have been determined in advance of the deposition. The Defendant essentially takes the position that it was an error for the Court to permit the deposition of the Victim before it was determined that she was competent. The Undersigned noted in the June 4 Order that counsel for the Defendant

2

had presented no specific factual basis to suggest that the Victim was not competent at that time. Nevertheless, the parties were encouraged to fully address the issue of competency on the record, before, during, and after the deposition.

Ordering the deposition of the Victim for the use at trial was appropriate and agreed to. At the time of the hearing addressing the preservation of the Victim's testimony, it was uncertain when the case would be tried, and based upon the circumstances, the age of the Victim, the Victim's health, and the positions of the parties, the Court felt it was proper to preserve the Victim's testimony, while permitting both parties with the ability to fully develop and explore any potential issues that they encountered with the Victim's testimony. Both parties were afforded a full and fair opportunity to question the Victim and there were safeguards put in place to ensure that both parties were fully able to develop their record.

Further, this Court notes that at the time of the Order authorizing the deposition, it was not ruling upon the admissibility of the deposition or the competency of the Victim. The sole issue resolved by the Court on June 4 was that preserving the Victim's testimony was appropriate pursuant to Pa.R.Crim.P. Rule 500. The Commonwealth was still required to meet the unavailability rules in the event that it wished to use the Victim's deposition at trial if it believed that the Victim would not be able to testify at trial.

The Defendant's second issue focuses upon the October 17, 2014 Memorandum and Order of Judge Spataro, finding the Victim competent at the time of her deposition.

Judge Spataro, in issuing his October 17 Memorandum and Order, had before him, presented by the parties, the full transcript taken from the Victim's July 17, 2014 deposition and reviewed the entire transcript including the Defendant's 47 examples of the Victim's purported defects of memory. Judge Spataro explained in his Memorandum and Order the law applicable to a determination of competency, first noting that every person is presumed to be a competent witness in a criminal case unless as otherwise provided by law. *See* 42 Pa.C.S. § 5911. Judge Spataro then explained the parameters where a court may find a witness incompetent to testify because of a "*mental condition or immaturity*" where the person: is, or was, at any relevant time, incapable of perceiving accurately; is unable to express herself so as to be understood directly or through an interpreter; has an impaired memory; or does not sufficiently understand the duty to tell the truth. *See* Pa. R.E. Rule 601(b) Judge Spataro explained that the burden of proof rests with the party asserting incompetency.

Judge Spataro noted that the Defendant had not pointed to any authority that suggested advanced age qualifies as a mental condition, for purposes of Rule 601(b). Judge Spataro then explained that even if advanced age qualified as a mental condition, there was insufficient evidence to conclude that the Victim in this case was not competent to testify. Judge Spataro noted that the Defendant's purported evidence of the Victim's faulty memory may serve to impeach the Victim's credibility at trial, and may affect how much "weight" the fact finder may

3

attribute to the Victim's testimony, but the evidence did not impact the Victim's competency to testify.

Judge Spataro in his Order recited specific instances where the Defendant claimed the Victim's memory was faulty, and dismissed them as explainable, understandable, or just not accurate characterizations. Judge Spataro resolved the initial question of the Victim's competency at the time of the deposition in the Commonwealth's favor in his capacity of "gatekeeper." Nonetheless, the issues raised by the Defendant certainly would have been impactful as to the weight of the testimony and appropriate for jury consideration.

The undersigned witnessed the deposition of the Victim at the time of trial and notes that while there were certainly spots where her testimony would appear inconsistent or not accurate, there were also significant periods of time where the Victim was conversational, appropriate, engaging, and meaningfully involved in the process of the deposition. In fact, on many of the key issues of the case the Victim was clear. The fact finder was ultimately capable of reviewing the testimony presented in the form of a deposition, comparing it with all of the other testimony and evidence of record, and determining what weight, if any, it should be given and how that testimony appropriately applied to the analysis of the elements of the offenses. Counsel for the Defendant was able to articulate and argue that the Victim's defects in memory and/or confusion should undermine the Victim's testimony in its entirety, but the jury was free to believe or not believe that. That question goes to the weight, not to the admissibility of the testimony.

Judge Spataro's opinion was not authored in a vacuum. He had at his disposal the entire deposition of the Victim and had the Defendant's 47-point list detailing instances where he believed the Victim was incapable of perceiving accurately or where she had an impaired memory. Judge Spataro went so far as to give examples where the Victim was able to recall and perceive facts pertinent to the case, namely that the Victim had no difficulty recalling whether she gifted the Defendant any money, or whether the Victim agreed to pay the Defendant a management or trustee fee, or for estate or court costs.

The Undersigned adopts the opinion of Judge Spataro dated October 17, 2014 in its entirety in supporting the denial of the Defendant's second issue on appeal.

The Defendant in his third issue challenges the Court's unwillingness to re-open the issue of competency when this Court determined the Victim to be unavailable for trial and permitted her deposition testimony to be used at trial.

On February 26, 2015, the Commonwealth filed a *Motion in Limine*, requesting the Court to permit it to use the Victim's videotaped deposition in lieu of her live testimony due to her unavailability. In its motion, the Commonwealth asserted that the Victim's health had deteriorated since her deposition and that she now resides in an assisted living facility. The Commonwealth asserted that the Victim is very "frail" physically. The Commonwealth posited

4

that because of the Victim's advanced age and physical ailments, it would be "extremely difficult" to bring her in to testify at trial.

The Undersigned scheduled a pre-trial hearing to address the Victim's availability at trial on the matter on March 9, 2015. The Court heard testimony from Dr. John Bailey, the Victim's treating physician, who testified regarding the Victim's overall current health status at, or around, the time of the trial. The purpose of Dr. Bailey's testimony was to determine the Victim's potential availability at trial. Dr. Bailey explained that the Victim in this case lived in a skilled-care facility, since at least 2014 and had recently been moved to an assisted living community because of her decline. Dr. Bailey testified that he had seen the Victim "yesterday," and that the Victim was "generally debilitated," but in "remarkably good health" for her age.

Dr. Bailey, when questioned, credibly opined that the Victim at that time had a "mild cognitive impairment" which would have been expected in her age group. The Defendant now asserts that Dr. Bailey opined that the victim had a "significant" cognitive impairment. However, the credible conclusions of Dr. Bailey were that, as of when he saw her the day prior, the Victim was oriented to "person, place, and time."

Dr. Bailey ultimately offered an opinion that it would be "very detrimental" to the Victim's health to be present at trial, due to her advanced age, frailty, and recent injuries. Dr. Bailey then noted that the Victim had not left her residence in over six-months and that she could not reasonably be a passenger in a car.

At the time of Dr. Bailey's testimony, counsel for the defense attempted to inquire about the Victim's condition in June or July of 2014, presumably inquiring into what the Victim's mental or physical state was at or around the time of her deposition, and the Commonwealth objected to the inquiry. The Commonwealth's objection was sustained as the purpose of the hearing was to determine the availability of the Victim for trial, and the issue of the Victim's competency, some nine-months before, had previously been ruled upon by Judge Spataro.

After hearing Dr. Bailey's testimony, and having an opportunity to cross-examine the doctor, counsel for the defense presented an oral motion to re-open the issue of the Victim's competency. Counsel for the Defendant was not seeking to address the Victim's competency at the time of. Dr. Bailey's testimony, which would not have been relevant, but rather sought to re-open the argument that the Victim was not competent at the time of her deposition.

Nothing about Dr. Bailey's testimony warranted the re-opening the issue of the Victim's competency at the time of the deposition and nothing learned from Dr. Bailey undermined the competency Order issued by Judge Spataro. Rather, Dr. Bailey focused upon the Victim's present status at the time of trial. Dr. Bailey opined that the Victim was physically compromised and was of an advanced age, and appearance at trial would be against her best interest.

While the Victim's cognitive abilities came up during Dr. Bailey's testimony, the examination was initially focused upon the Victim's current condition. The Defendant was nonetheless given the chance to ask Dr. Bailey some questions regarding the Victim's cognitive ability. Dr. Bailey characterized the Victim's cognitive ability at the time of trial as "benign forgetfulness" or "mild, cognitive impairment." Dr. Bailey stated that the Victim's purported impairment was not a "quantified" amount. Dr. Bailey explained that there are a number of mechanisms with which to determine cognitive impairment, none of which had been used in this case.

This Court noted in its Order finding the Victim unavailable that the Victim's competency had already been decided, and that nothing Dr. Bailey provided changed that Order, or re-opened the issue for additional discussion. Even on the eve of trial, Dr. Bailey indicated that the Victim was alert, awake, and provided cogent answers. Therefore, the Defendant's third issue is of no merit.

In his fourth issue, the Defendant argues that he was deprived of his right to confront the Victim when this Court determined her to be unavailable for trial. Secondarily, the Defendant also argues that his purported inability to confront the Victim at trial somehow prevented him from showing the Victim authorized him to be paid. He argues essentially that the Victim's alleged "incompetence" hurt his ability to cross-examine her and that her alleged incompetence denied her the ability to provide the "right" answers.

The Defendant had an opportunity to hear, firsthand, the Victim speak, observe and examine the Victim's thought processes, to fully and fairly examine the Victim under oath, and thereafter have the benefit of an entire transcript with which to formulate an informed argument as to the Victim's competency and ultimately her credibility, which the Defendant did.

The Confrontation Clause of the Sixth Amendment of the United States Constitution, made applicable to the states via the 14th Amendment, and Article I, Section 9 of the Pennsylvania Constitution, provides that in all criminal prosecutions the accused has the right to confront any witness bearing testimony against him. *Commonwealth v. Yohe*, 79 A.3d 520, 530-31 (Pa. 2013) *citing Pointer v. Texas*, 380 U.S. 400, 403 (1965); *Crawford v. Washington*, 541 U.S. 36, 51 (2004). The confrontation clause prohibits out-of-court, testimonial statements provided by a witness unless that same witnesses has been declared unavailable and the accused has had a prior, full and fair opportunity to cross examine the witness. *Crawford*, 541 U.S. at 53-56.

In this case, the Undersigned authorized the Victim's testimony be taken via deposition on June 4, 2014. The Victim's deposition was taken on July 14, 2014. The Defendant was present at the Victim's deposition, with the assistance of counsel. The Defendant had the opportunity to question and cross examine the Victim to the extent he deemed necessary.

6

It is clear from the record that the constitutional test for the confrontation clause has been met in this case. There is no evidence of record, and the Defendant does not argue and has not previously argued, that he was deprived of a full and fair opportunity to cross examine the Victim at the deposition and only takes issue with the competency of the Victim.

As to the Defendant's secondary argument in his fourth issue, the Defendant posits that he was not getting the "right" answers from the Victim because he alleges that she was incompetent and that somehow if the Victim was competent, her story would have changed and would have supported the Defendant's story. However, the facts gleaned from trial and the testimony of the Defendant himself about how much he was paid for the work he performed, that he initially didn't accept payment but later accepted payment for past work and also for future work not yet completed, the paper trail of receipts, and the sheer monetary value of the "work" he performed and was purportedly paid for undermines the argument the Defendant makes.

The fact finder was free to believe the Victim and find not credible the Defendant's own testimony about the work he had performed and how and why he was paid for that work. The Victim was not the sole piece of evidence for the fact finder to consider. The fact finder had numerous receipts prepared by the Defendant himself detailing the curious and often times incredible story the Defendant offered about how he was paid, testimony from the Defendant's work associates, various checks detailing large sums of money that were paid, at times not corresponding date-wise with receipts for those checks, and the subject lines of the checks which did not reflect the work done as reflected in the Defendant's testimony. The fact finder certainly could take into consideration or reject the story that the Defendant provided.

Finally, the Defendant argues the sufficiency of the evidence for the forgery counts as found at trial. In his Concise Statement, he does not delineate which forgery counts he takes issue with, whereas in his post-sentence motions, he specifically attacked forgery counts 46, 47, 49, 51, and 52. Regardless, the evidence adduced at trial, presented to the fact-finder, establish the elements for all forgery counts as charged.

"In evaluating a challenge to the sufficiency of the evidence, we must determine whether, viewing the evidence in the light most favorable to the commonwealth as verdict winner, together with all reasonable inference therefrom, the trier of fact could have found every element of the crime charged beyond a reasonable doubt." *Commonwealth v. Wall*, 953 A.2d 581, 584 (Pa. Super. 2008) In applying this standard, the Commonwealth may sustain its burden wholly by circumstantial evidence, and the trier of fact, in its role of weighing and assessing credibility of witnesses, is free to believe all, some, or none of the evidence. *Commonwealth v. Kennedy*, 959 A.2d 916, 921 (Pa. 2008)

The charge(s) of Forgery in this case are found at 18 Pa.C.A. § 4101(a)(2) and § 4101(a)(3).

7

In reviewing the sufficiency claim, the Court notes that at all times credibility is the parlance of the jury and despite what the Defendant perceives as clear indicators of the lack of competency and/or at least credibility of the Victim, the Victim's testimony, if believed, would certainly coordinate with all of the other evidence to establish the elements of the offense(s). An analysis of the weight of the Victim's testimony in coordination with all of the other evidence presented at trial, clearly established the elements of the various offenses as a matter of law.

The analysis of the evidence does not start and end with the Victim's testimony as the vast scope of evidence was presented by the Commonwealth and the Defendant himself in the case. The majority of the evidence presented came from other sources than the Victim, and the jury certainly was able to analyze that evidence to meet the elements as to the Forgery counts. In fact, reasonable conclusions could be drawn from the Defendant's own answers on direct and cross examination that would allow the jury to take his testimony in some respects, without regard to the Victim, and find that the material elements of the offenses had been established.

The jury was also free to consider the testimony of other witnesses that the Defendant interacted with, testimony which easily inferred the Defendant's guilt. The Jury could review the individual checks themselves, including the difference in the handwriting, the different memo-lines explaining the reason for the individual payment, and the dates contained on the checks. Finally, the jury could review the receipts that the Defendant testified he produced after issuing each check, and analyze their contents in comparison to the checks that they corresponded with, and also determine whether they believed the Defendant's story.

There were various issues with the Defendant's testimony, beginning with how he was paid by the Victim. The Defendant's overall stance is that he was paid by the Victim for work from 2010 until 2014, a total of $189,750.00 as reflected in 22 separate checks written over only 25-months. All of the checks were deposited into one of the Defendant's bank accounts and the checks were written between November of 2011 and December of 2013.

The Victim testified at her deposition that she had never given the Defendant permission to take the funds at issue from her. The Victim further provided that she never gifted the Defendant money from her bank accounts, never intended to pay the Defendant a management or trustee fee, and never gave the Defendant any permission to fill out any of her checks for his own benefit.

In regards to the specific checks at issue that formed the basis for the Forgery charges, the Commonwealth presented each check to the Victim at her deposition, and asked if she had endorsed or authored the checks. The Commonwealth's theory was that while the Victim may have signed the checks at issue, the Defendant filled in the payor line, amounts, and memos, which would have been a conclusion that could be drawn by the jury, based upon the testimony of record, from sources other than the Victim.

8

The Defendant, in regards to Check # 139 and # 142, the basis for Count 47, confirmed that he personally signed the checks and that he received the checks and put the proceeds into his account. The Defendant went on to testify that he signed the check in front of the Victim, and also that he signed Check # 142 by mistake.

In regards to the specific checks at issue, the Defendant indicated that he watched the Victim sign each check and that she would sign and then, according to her, would ask him to fill out the checks. When asked how it was possible that he signed his own name to two checks drawn on her account when he indicated he had seen her sign all of the checks, the Defendant explained that it was "really stupid," "I don't know, I can't imagine, but she kept telling me that I was her successor trustee to take care of stuff because she couldn't do it, and in July of 2012 I filled out a couple of checks and signed it successor trustee and also paid a couple of other bills."

The Defendant did not know why the Victim didn't sign the checks and he didn't remember doing it. There were also initials next to the signature on the check, although the Defendant did not recall having the Victim initial the checks.

The Defendant provided various explanations of how and why he was paid and what specifically he was paid.

The Defendant testified at length about the nature of his relationship with the Victim and the services he provided for her. The Defendant described his relationship with the Victim as a "friend," that he met with her "all the time," and that she was pleasant and "needed help." The Defendant indicated that he did anything at any time that the Victim wanted something. For example, he would run to the bank for her, check her mail a few times a week, and review her finances weekly and monthly. When the Victim lived in her home, the Defendant would see her approximately two to three times a week. Initially it started out as only a couple of times a month, but starting in about March of 2010 moving forward, the Defendant would spend four to five hours a week with her at her request. The Defendant eventually assisted her in getting a place at the Wesbury Retirement Community in Meadville.

After the Victim moved to Wesbury, he would visit her two to three times a week driving approximately 45 minutes each direction. In 2010, 2011, 2012, and 2013, he would take care of her bills, review her mail, and in 2012, he "assisted" the Victim in selling her house. The Defendant estimated that he spent two to three hours a week doing things for the Victim at the house once she had been moved to assisted living, including shoveling her sidewalk and driveway, meeting a furnace technician on a couple of occasions, sold her car for her in 2011, and took out the garbage and "things like that."

The Victim would also ask the Defendant to stop at Cracker Barrel or McDonalds and pick up lunch for her. He helped get rid of the furnishings and other household amenities, some which were sold and deposited into her account, and helped get her TV set up at the assisted

9

living facility. The Defendant indicated that he had arranged for renovations and repairs of the Victim's home, as requested by the realtor.

The Defendant also apparently coordinated the preparation and filing of her tax returns by individuals within his office. He also apparently assisted the Victim in preparing estate planning documents including trusts. The Defendant was aware that the value of the Victim's assets were approximately 1.2 million dollars. The Defendant stated that he would monitor the "trust" with the Victim and they would spend a couple hours every month going over her finances, investments and the paperwork. The Defendant assisted her in drafting amendments to the trust in 2013. The Defendant indicated that the Victim insisted on his involvement and that he spent 15-20 hours of his time assisting her despite the fact that he had referred her to counsel that prepared all of the documents.

While the Victim's total assets were believed to be approximately 1.2 million dollars they were largely made up of stock that she had obtained from her former employer that was valued at approximately $800,000.00. Those stocks were held and managed by another investment agency/broker and were not initially subject to the Defendant's control nor were they invested through him or his agency. At some point, on his advice, he assisted the Victim in selling the $800,000.00 worth of securities which led to a large capital gain and he then directed the proceeds into two separate accounts. After the sale of the securities the Defendant arranged for the acquisition of two annuities. The testimony reflects that the Defendant received commissions on both annuity acquisitions over and above the fees and monies referenced in this case.

The Defendant explained that starting around March of 2010 he had become more involved in the Victim's activities and doing "work" for her and that he did that for approximately 10 months from March of 2010 through February of 2011 on an average of about five hours a week and he was not paid for any of it. According to him, he explained to her that he couldn't continue to do that and the Victim agreed to pay him his going rate for "estate planning" of $150.00 per hour. He explained that if he worked more than 20 hours a month he would be compensated additionally based upon his agreement. Once the agreement was reached the Defendant was allegedly provided with checks from the Victim to cover his past work for which he had previously indicated he did not intend on getting paid. The Defendant explained that there was no written agreement for him to take these fees from the Victim and instead described it as a "verbal handshake" and that he didn't put it in writing because of the relationship that he had with the Victim, which he described as though she was his mother.

On examination, the Defendant acknowledged that he had received $189,750.00 from the Victim and according to him even though all of the checks were written out and cashed in the years 2011, 2012, and 2013 the amounts paid actually covered the calendar years of 2010, 2011, 2012, 2013, and 2014. Fees from 2010 were explained as being paid in 2011 after they had agreed he would receive payments and the 2014 payments were made in advance of the calendar year of 2014 because, according to him, he was talking to the Victim about retiring, but he

10

wanted to make sure that the Victim was appropriately taken care of, so the Victim paid him in advance in three $12,000 installments.

Despite the fact that the Defendant's testimony at times reflected that the fees taken were purported to be for his assistance in helping the Victim, the memo line on many of the checks were filled in with varying explanations.

The Commonwealth in its case in chief presented the various checks all payable to the Defendant:

| Check # | Check Date | Amount | Memo Line |
|---|---|---|---|
| 131 | 02/06/2011 | $6,000.00 | |
| 2719 | 10/26/2011 | $3,000.00 | |
| 2725 | 11/04/2011 | $10,000.00 | Retainer Estate Planning |
| 2802 | 01/30/2012 | $600.00 | 2011 Trust Taxes |
| 134 | 02/14/2012 | $12,000.00 | |
| 139 | 07/11/2012 | $6,000.00 | 2012 Trustee Fee |
| 142 | 07/27/2012 | $12,000.00 | 2012 MGT Fee |
| 2899 | 10/19/2012 | $12,000.00 | Ann MGT Fee |
| 143 | 10/23/2012 | $6,000.00 | Trustee Fee |
| 144 | 11/29/2012 | $12,000.00 | |
| 145 | 12/13/2012 | $6,000.00 | |
| 146 | 01/02/2013 | $6,000.00 | |
| 149 | 02/11/2013 | $6,000.00 | 2013 MGT Fee |
| 150 | 02/11/2013 | $6,000.00 | 2013 Trustee Fee |
| 152 | 03/02/2013 | $12,000.00 | MGT Fee + Trustee Fee |
| 153 | 06/08/2013 | $12,000.00 | |
| 154 | 07/02/2013 | $2,150.00 | Accounting + Legal Fees |

| 155 | 08/28/2013 | $12,000.00 | |
|------|------------|------------|--------------------------|
| 156 | 09/18/2013 | $12,000.00 | TTE Fee's |
| 2981 | 10/08/2013 | $12,000.00 | TTE Fee |
| 158 | 11/06/2013 | $12,000.00 | Court Costs Fees 2014 |
| 159 | 12/3/2013 | $12,000.00 | |

In 2011, the Defendant received three checks totaling $19,000. In 2012, the Defendant received eight checks totaling $66,600. In 2013, the Defendant received 11 checks totaling $104,150.00.

The Defendant's explanation of how and what he was to be paid when compared to the checks themselves and the other exhibits coupled with the pattern of payments and the memo lines certainly raised material and significant questions that could have been used by the jury in determining whether evidence existed from the Defendant's own testimony to convict the Defendant beyond a reasonable doubt of the charged offenses. The Defendant's explanation of what he did for those funds and how the agreement was reached contrasted with the Victim's version materially and fundamentally, but even more importantly was inconsistent with the Defendant's other statements and actions.

At one point in time the Defendant explained that he had been authorized to charge a 1% Trustee fee and in fact he explained to other people that he was taking that fee, but then indicated that he was not actually charging her that fee.

The Defendant testified that he believed, despite the fact that the trust documents never made him actively the current trustee, that it was appropriate to take a trustee fee. He explained that he believed as the successor trustee that he had the power and ability to charge that fee for the various types of work that he was doing on behalf of the Victim. He further explained that he understands now that he was not allowed to take a trustee fee and that he did not have any real powers as trustee until after Ms. Steiner's death, but at the time he believed that he was authorized to do so. This explanation by the Defendant certainly could have been evaluated by the jury in contrast to his testimony that he had been involved with hundreds of trust documents in the past and that was a significant portion of his business and that he was familiar with trusts and that he actually had received compensation from Ms. Steiner for his efforts in helping her prepare her trust and make choices as to what she should do.

13

Even if you could somehow believe that the Defendant appropriately and foundationally believed that he was allowed to take a trustee fee, his own testimony as well as testimony of other witnesses suggested that he was taking a 1% trustee fee. Just doing math on the 1.2 million dollars that was alleged to have been a part of Ms. Steiner's total assets, without regard to whether the assets were actually in the trust, or even under his control, he would only be taking $12,000 per year as a trustee fee.[1]

The Commonwealth called multiple witnesses who testified about inconsistent explanations the Defendant had given them about what he was taking from Ms. Steiner and why.

The Commonwealth called Gregory Bentley, the CEO of Fortune Financial, who testified that when they confronted the Defendant about the amounts that he was being paid by Ms. Steiner, he told them that she had been a longtime friend and that he had worked with her many times over the years and that he helped her pay bills and that he was acting as a trustee on her account. He explained that he was receiving 1% of the value of the account and that the account was in excess of one million dollars. Mr. Bentley conveyed to the Defendant that the fees and manner in which he was charging were inconsistent with the situation or applicable rules and outside the scope of the Defendant's authorization as an independent contractor for the money management company.

The Commonwealth called Todd Williams, a co-worker/employee of the Defendant who worked in the same office and who also happened to be his son-in-law to testify. His primary function with respect to the Victim was preparing her personal income taxes at the request of the Defendant. The Defendant never informed Mr. Williams that he had been paid by the Victim, in any capacity, and the Defendant never requested Mr. Williams to prepare 1099's reflecting his work for the Victim. Mr. Williams was paid separately for the preparation of the tax returns for the Victim.

Mr. Williams testified, upon a review of the various exhibits, that a check dated January 30, 2012 in the sum of $600.00 made payable to the Defendant, with a memo line of "2011 Trust Taxes" was not based upon anything that he personally had done and that there were no trust tax returns filed and that, based upon his understanding of the Victim's situation, there would have been no need to pay anyone for trust taxes in 2011. Mr. Williams indicated that he recognized the handwriting on the check as the Defendant's handwriting, based upon having worked with the Defendant for a period of time.

---

[1] The record is unclear on the actual value of the trust. Instead the testimony focused on the overall value of the assets described in the Defendant's testimony as the Defendant articulated that his fees were for his management of the trust. It is notable that the jury had facts at its disposal that at first almost $800,000 of the Victim's funds were tied up in one stock managed by a different broker and that on the Defendant's directive, the stock was sold and two annuities were purchased. The Defendant received a separate commission for the annuities, not reflected in the amounts at issue. Therefore, for the vast majority of the relevant time periods, the actual value of the trust that the Defendant purportedly managed or monitored was significantly less than the 1.2 million of listed assets.

Mr. Williams testified in response to a check dated November 6, 2013, made payable to the Defendant in the amount of $12,000.00 with a memo line of "Court Costs-Fees," that the Victim was not involved, in the calendar years of 2011, 2012, or 2013, with any litigation and recognized the handwriting, except for the signature on the check, to be the Defendant's signature.

Mr. Williams testified that in December of 2013 he found copies of various checks laying throughout the office in different places. The checks were written out to the Defendant for large sums of money from the Victim's account. After discovering the checks, Mr. Williams sought out the Defendant to talk about circumstances of the checks and asked the Defendant to explain them. The Defendant's response was "it's none of your business." As a result of having observed the checks and the Defendant's response, Mr. Williams immediately notified their broker dealer and an attorney who had been involved with preparing some of the Victim's documents and whom both the Defendant and Mr. Williams had worked with.

The Commonwealth called Attorney Kahle who had prepared various estate planning documents for the Victim, including trusts and trust modifications. Attorney Kahle testified that he received a call in January of 2014, shortly after Mr. Williams discovered and confronted the Defendant about the checks at issue. An appointment was scheduled with the Defendant and ultimately held on or about January 8, 2014. The Defendant indicated to Attorney Kahle that there was a problem with respect to a mutual client of theirs, the Victim, and that his business partner, Mr. Williams, was "giving them problems." The Defendant said that Mr. Williams had confronted him and, according to the information conveyed, had accused the Defendant of stealing money and that he was worried about what Mr. Williams would do with that information. Mr. Williams had expressed concern about having been listed in some of the trust documents and demanded that he be removed. The Defendant went on to explain that he had received money from the Victim based upon a verbal agreement to charge $1,000.00 per month as a "money management/trustee fee." The Defendant did not mention any additional sums or amounts. Attorney Kahle replied with, along the lines of, "while I can't speak to your broker dealer's position on having verbal agreements with clients or whether $1,000.00 a month is appropriate for the amount of assets that were being managed, I don't know how you can call it a trustee fee if she alive." When confronted with that explanation from Attorney Kahle, the Defendant continued and said "business had been tough since the economy took a downturn, that he had gotten divorced in recent years, and that he was a little depressed."

George Campbell, an accountant who prepared the Defendant's tax returns for the calendar years of 2011, 2012, and 2013 testified. He explained that the Defendant's company acted as a subchapter "S" Corporation, and that his social security number would be the number to appear on any 1099's. In 2011 the Defendant had an adjusted gross income of $7,542.00, in 2012 he had an adjusted gross income of $15,838.00, and in 2013 he had an adjusted gross income of a negative $6,160.00. In both 2012 and 2013 the Defendant had zero tax due. Mr. Campbell explained the process by which the tax returns were prepared, in that the Defendant

15

would have given him all of the information necessary to prepare the tax returns and that he would have prepared them. The Defendant had actually written some of the documents and notes given to the preparer.

On cross examination it was clear that the Defendant in fact had higher corporation earnings in 2011 of $127,292.00, $100,950.00 in 2012, and $95,535.00 in 2013. Mr. Campbell explained that recently, around the time of the trial, the Defendant asked him to amend his 2012 return to reflect a $36,600.00 payment that had been "missed." That amount was, by implication, the amount paid by the Victim. The checks from the Victim to the Defendant in 2013 totaled $104,000.00 which was that year, in and of itself, more than the entire amount of income reported by the Defendant. The amount that he did report was reflected on the commissions' portion of the tax return.

The testimony surrounding the receipts the Defendant prepared for the Victim was also notable. The Defendant testified at length about the receipts he prepared for the payments he allegedly received from the Victim. The Defendant kept them in his records as well as in her "trust" which was later determined to mean that he kept "her copy" in a file in his office. He therefore had two copies of the receipts and the Victim had none. The Defendant indicated that he offered copies of receipts to the Victim, but that the Victim did not want them because she was afraid she might lose them.

The Defendant explained that he prepared each receipt front of the Victim, that he wrote each receipt at the same time the check was prepared, and according to him that he never went back and looked at them again. However, there were a few instances where the Defendant's own testimony refuted what he claimed to have been the case. A thorough review of the receipts entered into evidence reveals peculiarities, namely that some receipts appear to have information or dates "scribbled" out and replaced with new dates. (Defendant's Exhibit 12, Receipt # 406707, #406728, #406732) In July of 2012, the Defendant supposedly was paid for services rendered in November and December of 2010 (Defendant's Exhibit 12, Receipt # 406714)

The Defendant said that he filled out the receipts at the time checks were issued and that they were done sequentially, however receipt number 734 was for a check from July 2, 2013 but receipts 729, 730, 731 were for August, September, October, November and December.

Further, the Commonwealth demonstrated that a receipt for $6,000.00 for November and December of 2011 was written for a check from November 29, 2012 and paid by check number 144, however check number 144 was for $12,000.00. When confronted with these facts, the Defendant indicated that he corrected that receipt and that he had put down six and then corrected it because "it went back to February on that one" and the correct amount was $12,000.00 not $6,000.00 and that he "didn't catch it until later." The corrected receipt was written from a different invoice and receipt book, but was dated and prepared on the same day as the original check. Despite the fact that the receipt was dated November 29, 2012, the

16

Commonwealth showed the Defendant the print information on the bottom of the receipt and a notation that the receipt was actually manufactured/printed from December of 2013. When confronted, the Defendant indicated that he "just did not remember."

The summary of the entire Defendant's testimony regarding the checks and their purpose, the manner in which he was paid, and his ever-changing stories of how much he was to be paid and why he was being paid could certainly be taken into consideration by the fact finder. The multiple theories which he advanced, coupled with the unusual evidence about the receipts, all could be interpreted, balanced, and weighed by a jury to support the allegations of the Commonwealth.

The totality of the evidence, taken in the light most favorable to the Commonwealth, supports the conclusion that the jury had sufficient evidence with which to find the Defendant guilty of the numerous counts of Forgery beyond a reasonable doubt.

Finally, the Defendant notes at the end of his Concise Statement that his initial sentence of 60 to 240 months, as reflected at sentencing, was later amended to 60 to 480 months, and suggests that the Court "did not believe the change resulted in any additional imprisonment." The sentence as reflected in the original, non-amended order, read in the aggregation paragraph as 60 to 240 months of incarceration. However, the body of the sentence at each count actually totaled 60 to 480 months. The sentencing Order was later amended only in the aggregation paragraph due to the misstatement to reflect the accurate calculation of 60 to 480 months. The Amended Sentencing Order did not change the individual sentences imposed and only served to correct the error in the original sentencing Order. It is also important to note that the Defendant was ordered to pay restitution of roughly $190,000 as part of his sentence.

For the reasons stated above and in Judge Spataro's October 17, 2014 Memorandum and Order, the Defendant's convictions should be upheld.

**Respectfully Submitted,**

_____ J.

17

IN THE COURT OF COMMON PLEAS OF CRAWFORD COUNTY, PENNSYLVANIA

CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA :
:
:
v. : No. CR 503– 2014
:
DAVID E. A. SEAGREN, :
Defendant :

Douglas W. Ferguson, Esq., A.D.A.
Michael J. Antkowiak, Esq., Attorney for Defendant

**MEMORANDUM and ORDER**

John F. Spataro, J.

The Defendant, David E. A. Seagren, filed a motion requesting the Court to rule on his two objections made at the deposition of his victim, Dorothy Steiner. At oral argument held on October 13, 2014, the Defendant withdrew one objection, leaving only his objection to the competency of the deponent to testify as a witness. In the interest of addressing competency prior to the presentation of testimony before the fact factor, as encouraged by Judge Stevens' Order of June 4, 2014 scheduling the deposition, the Court holds, for the reasons set forth herein, that Ms. Steiner was competent to testify at her deposition.

The videotaped deposition was taken on July 17, 2014 solely for the purpose of preserving testimony, in consideration of Ms. Steiner's advanced age of ninety-eight. The Court has reviewed a transcript of the deposition (the "Transcript") provided by the

1

17

Commonwealth to Judge Vardaro when oral argument was originally scheduled.[1] Lacking evidence of any specific impediment to competency, the Defendant has offered a listing which references the Transcript and describes forty-seven purported "Examples of Incapability Of Perceiving Accurately and/or Impaired Memory." Defendant's Exhibit A.

## Controlling Authority

Every person is presumed to be a competent witness in a criminal proceeding except as otherwise provided by law. 42 Pa.C.S. § 5911. The statutory disqualifications are limited to spouses and counsel for the defendant with respect to confidential communications. *Id.* §§ 5914, 5916. The common law on competency is embodied in Rule 601 of the Pennsylvania Rules of Evidence, of which subsection (b) provides as follows:

> A person is incompetent to testify if the court finds that because of a mental condition or immaturity the person:
>
> (1)　is, or was, at any relevant time, incapable of perceiving accurately;
>
> (2)　is unable to express himself or herself so as to be understood either directly or through an interpreter;
>
> (3)　has an impaired memory; or
>
> (4)　does not sufficiently understand the duty to tell the truth.

*Cf. Commonwealth v. Goldblum*, 498 Pa. 455, 465, 447 A.2d 234, 239 (1982); *Rosche v. McCoy*, 397 Pa. 615, 620-21, 156 A.2d 307, 310 (1959) ("There must be (1) such capacity to communicate, including as it does both an ability to understand questions and to frame

---

[1] Although the Commonwealth remarked at oral argument that a videotape of the deposition had been placed of record, it is not referenced in Judge Vardaro's Order of October 3, 2014, and has not been located. Defendant's counsel asked that the videotape be reviewed only "if appropriate," and the Court finds its viewing to be unnecessary in ruling upon the objection.

2

and express intelligent answers, (2) mental capacity to observe the occurrence itself and the capacity of remembering what it is that she is called to testify about and (3) a consciousness of the duty to speak the truth."); *Commonwealth v. Payton*, 258 Pa. Super. 140, 143, 392 A.2d 723, 724 (1978). The burden of proof rests with the party asserting incompetency. *Goldblum, supra*; *Rosche*, 397 Pa. at 620, 156 A.2d at 309.

## Discussion

The Defendant challenges the deponent's competency to testify on the basis of her allegedly inaccurate perception and impaired memory.[2] Among his examples are misstating how long she had known him,[3] or recalling whether they had met regarding her finances. His listing details her uncertainty as to who completed the payees or amounts on various checks shown to her by the Commonwealth, and disputing her signature. He emphasizes her inability to remember various aspects of her revocable trust, offering the trust agreement at oral argument as Defense Exhibit B.

The Defendant has not shown, or even alleged, that Ms. Steiner's alleged inaccuracies or memory impairment are due to any mental condition other than her age, arguing that he does not have access to her mental health records. He has not directed us to any authority which would suggest that advanced age qualifies as a mental condition for purposes of Rule 601(b).

---

[2] The Defendant does not contend that Ms. Steiner was unable to express herself so as to be understood, or that she lacked a sufficient understanding of her duty to tell the truth. See Pa.R.E. 601(b)(2), (4). She, indeed, made apposite responses to questioning about her background and present circumstances, and answered that she would be charged with a crime when asked about the consequence of not telling the truth. Transcript, pp. 4-9.

[3] Agreeing on *voir dire* with defense counsel's statement that she told a policeman that she had trusted the Defendant since 1935, which was many years before his birth, she also testified that she had first known him when her mother was still alive, and that it was "[w]hen he came to Ford City, when he was just starting his business." Transcript, pp. 9, 37.

3

Even if it did, the Court is not convinced that the testimony cited as evidence of perceptual inaccuracies or memory lapses robs Ms. Steiner of competency to testify. A witness must only be able to have accurately perceived and recall the facts that form the basis of the challenged testimony. Ms. Steiner's testimony is in regard to the execution of certain bank checks between the years 2011 and 2013. The inability to recall details of her estate planning, or of her police interview, is irrelevant.[4]

Certainly, her age did not prevent Ms. Steiner from observing with accuracy the Defendant's involvement with the subject drafts. The gravamen of Defendant's objection is instead the deponent's faulty memory. He points, for instance, to line 18 at page 19 of the Transcript, wherein Ms. Steiner answered, "This was a long time ago. I don't know," when asked whether she had written the Defendant's name on Check No. 142. A moment later, however, at line 3 of page 20, she replied, "Oh, no" when asked again whether she had written his name, after having had an opportunity to review the entire check and identify her initials. See also, e.g., Transcript, p. 12, lines 13-15 (as to Check No. 2719), p. 13, lines 13-15 (Check No. 2725), p. 15, lines 15-17 (Check No. 2899), p. 17, lines 3-5 (Check No. 131) and 22-23 (Check No. 194). Elsewhere, she logically is unsure who wrote the payee or amount on various checks, since (she contends) she did not do so; and, as she aptly commented at page 24, lines 14-15, "it would be hard to say" who wrote the numbers indicating the amount of the check: "It looks like anybody's '6,000.00.'" Whether her signatures on the checks are all genuine is at most a peripheral issue.

---

[4] The Defendant's examples of incompetency are also sometimes misstated, e.g., Defendant's Exhibit A refers to page 33, lines 13-15 of the Transcript, in which the deponent answered, "I don't recall," when asked about talking with about the police about being victimized. She thereafter, however, identifies Detective Stefanucci, and affirmatively states that she remembers the interview. Transcript, pp. 33-34.

Ms. Steiner had no difficulty in recalling whether she gifted money to the Defendant, or had agreed to pay him a management or trustee fee or for estate planning or court costs, as noted on the checks. The Defendant may possess evidence with which to impeach her credibility, but such evidence has no impact on her competency to testify. Any inability to answer questions about events remote in time[5] does not render Ms. Steiner incompetent due to an impaired memory when the prosecution is for offenses allegedly committed within the past three years.

Accordingly, we enter the following

## ORDER

AND NOW, this 17th day of **October, 2014**, upon hearing, and for the reasons set forth in the foregoing Memorandum, the Court hereby OVERRULES the Defendant's objection to the competency of Dorothy Steiner to testify at the time her deposition was taken. The Court makes no determination of Ms. Steiner's competency to testify in person at the trial should she be called as a witness.

BY THE COURT,

_____
Judge

Distributed by Clerk of Court
Date as Filed 10-20-14
D.A            e-mail
Def. Atty.     Antkowiak-fax
Def.
Jail
Apo
Sheriff
Other          PD e-mail

---

[5] Defense Exhibit A notes her statement, "You ask questions I can't answer," made, however, when she was asked about a financial consultation occurring more than four or five years ago.

-5-